***********
Upon review of the competent evidence of record with reference to the errors assigned, and finding no good grounds to receive further evidence or to rehear the parties or their representatives, the Full Commission upon reconsideration of the evidence reverses the Opinion and Award of the Deputy Commissioner.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties in their Pre-Trial Agreement and by written stipulation after the hearing before the Deputy Commissioner:
 STIPULATIONS
1. The Industrial Commission has jurisdiction over the subject matter of this case, the parties are properly before the Commission, and the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act at all relevant times.
2. American Home Assurance was the carrier on the risk.
3. The Employee-Employer relationship existed between the parties at all relevant times.
4. Plaintiff sustained an admittedly compensable injury by accident to his right ankle on 22 May 2000.
5. Plaintiff's average weekly wage was $286.22, which was sufficient to yield a weekly compensation rate of $190.83.
6. The issues for determination are:
a. Whether Plaintiff's ongoing medical treatment for his right ankle and any disability resulting from said injury are the direct and proximate result of his compensable 22 May 2000 accident?
b. To what, if any, benefits is Plaintiff entitled to recover under the Act?
7. The parties stipulated the following documentary evidence:
a. Plaintiff's Answers to Interrogatories; six pages;
b. Records of Boice-Willis Clinic, fifteen pages;
c. Records of Carolina Urgent Care, twelve pages;
d. Records of Rocky Mount Orthopaedics, ten pages;
e. Records of Duke Medical Center, three pages; and
f. Plaintiff's Employment Records, eleven pages.
 ***********
Based upon all the competent evidence adduced from the record and the reasonable inferences therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, Plaintiff was forty-two years old and had been employed at Defendant-Employer's Rocky Mount store as a customer service manager since December 1998.
2. On 22 May 2000, the Rocky Mount store sent Plaintiff to the Knightdale Wal-Mart store to assist in remodeling that store. While working at the Knightdale store, a stack of shelves fell on Plaintiff's right ankle. He reported his accident and injury to a manager at Wal-Mart's Knightdale store. Plaintiff had previously sustained an injury to his right foot while working for Defendant-Employer about a year earlier when an open file drawer fell out and struck him on his right foot and ankle. At that time, Plaintiff was on crutches for about two weeks, but thereafter, his symptoms resolved and he did not file a workers' compensation claim.
3. The day after his 22 May 200 injury, Plaintiff reported his accident to Wal-Mart's Rocky Mount store manager, who referred him to Nash Urgent Care for evaluation and treatment of his ankle injury. The treating physicians at Nash Urgent Care requested x-rays of Plaintiff's ankle, which were negative for any fractures or dislocations. The treating physicians at Nash Urgent Care diagnosed Plaintiff as having a contusion to his right ankle. Nash Urgent Care provided conservative treatment for Plaintiff's ankle injury for approximately five months. The treatment did not relieve Plaintiff's ankle pain or eliminate the swelling in his ankle. A Nash Urgent Care physician referred Plaintiff to Dr. Greig V. McAvoy, an orthopedist at Rocky Mount Orthopedics and Sports Medicine. Defendant-Employer treated Plaintiff's claim as a "medicals only" claim and began paying for Plaintiff's medical treatment.
4. After examining Plaintiff's ankle on 11 October 2000, Dr. McAvoy was of the opinion that Plaintiff had developed tendonitis secondary to his 22 May 2000 ankle contusion. He also noted that Plaintiff was extremely flat footed (pes planus), which in his opinion predisposed him to the development of tendonitis. Dr. McAvoy treated Plaintiff conservatively with medications, foot exercises and supportive footwear.
5. Plaintiff's ankle injury improved during the course of Dr. McAvoy's treatment, but he continued to have pain and swelling in his right ankle, especially when he was on his feet for extended periods of time. Plaintiff did not seek medical treatment, however, during the period from 29 December 2000 through 5 June 2002. During said period, Plaintiff's right ankle condition deteriorated to the point that he required medical attention. After some delay in getting approval from Wal-Mart, Plaintiff returned to Dr. McAvoy for further evaluation and treatment of his right ankle on 6 June 2002.
6. Dr. McAvoy examined Plaintiff's right ankle, and was of the opinion that Plaintiff's ankle pain and the deformity that he found were not related to his ankle injury. It was Dr. McAvoy's opinion that Plaintiff's pes planus had stressed his posterior tibial tendon to the point that the tendon was now failing and deteriorating. He also diagnosed Plaintiff as having tendonitis in the right ankle and possibly Ehlers-Danlos Syndrome.
7. Dr. McAvoy placed Plaintiff's ankle in a 3-D Pro-Walker, prescribed Naprosyn (500 mg), and ordered Plaintiff to rest the posterior tibial tendon to relieve the inflammation. In spite of this treatment, Plaintiff's posterior tibial tendon continued to deteriorate. As the tendon failed, Plaintiff's right foot rotated further laterally and became more deformed. On 6 December 2002, Plaintiff's ankle had not improved and Plaintiff wanted to know whether the deformity could be eliminated or improved by surgery. Dr. McAvoy referred Plaintiff to Dr. Mark E. Easley at Duke University Medical Center to determine whether Plaintiff was a surgical candidate. Dr. Easley is on the faculty at Duke Medical Center and is a board certified orthopedic surgeon, with a sub-specialty in foot, ankle and knee surgery.
8. Dr. Easley examined Plaintiff on 20 February 2003. He found that the posterior tibial tendon in Plaintiff's right ankle was non-functional, his right heel was tilted outward and away from his left foot, Plaintiff had no arch in his right foot, and his toes on the right foot were pointing in such a manner that it appeared as if the inside of his right ankle bone was trying to touch the floor. The deformity of Plaintiff's foot was "fixed," meaning it could not be forced completely back to a neutral position. Plaintiff walked with a limp and was using a CAM walker. Plaintiff told Dr. Easley that he had always been flat footed but his left foot and right foot were the same until his work injury in May 2000. Dr. Easley obtained x-rays and ordered an MRI.
9. Dr. Easley performed a triple arthrodesis or fusion of Plaintiff's ankle on 16 June 2003. Plaintiff was completely off his feet for three months after the surgery. On 23 September 2003, Dr. Easley found Plaintiff's ankle to be properly aligned with his leg; he had a good arch, his ankle was fixed in the neutral position, and x-rays confirmed that fusion was occurring at the joints. Based on these findings, Dr. Easley permitted Plaintiff to gradually advance to weight bearing. After one month, Plaintiff was able to tolerate full weight bearing on his right foot.
10. Defendant-Employer terminated Plaintiff's employment on 22 May 2003, for reason unrelated to his injury. Plaintiff's termination occurred prior to his 16 June 2003 surgery, which caused additional disability.
11. Dr. Easley was of the opinion that Plaintiff's right posterior tibial tendon dysfunction for which he treated Plaintiff began with the traumatic injury to his right ankle. He based his opinion, in part, on Dr. McAvoy's medical records in which Dr. McAvoy reported that Plaintiff had a contusion of the right ankle and hindfoot. These records confirmed to Dr. Easley that the contusion occurred at and around the posterior tibial tendon and the spring ligament, (the primary tendon and the primary ligament that support the medial arch). Dr. Easley further noted from the records that the contusion was followed by tendonitis, which lasted longer than the inflammation that would normally result from such an injury of the plantar flexor, which includes the posterior tibial tendon. Dr. Easley testified that posterior tibial tendon problems are scientifically known to develop sequentially. He opined that in Plaintiff's case, there was an obvious contusion of the tendon, a diagnosis of tendonitis secondary to the contusion, followed by a progression from a Type 1 to a Type 3 dysfunction that was consistent with the sequence of deterioration common in posterior tibial tendon injuries.
12. Dr. Easley opined and the Full Commission finds that Plaintiff's right posterior tibial tendon dysfunction was causally related to his ankle injury of 22 May 2000; that the progression of Plaintiff's dysfunction and deformity from the time of his accident to complete tendon failure (fixed deformity) was consistent with the rate of deterioration common in posterior tibial tendon injuries; and that Plaintiff's injury was a classic example of a progression from an obvious contusion to secondary tendonitis, to tendon pathology, and finally, to deterioration of the posterior tibial tendon.
13. Dr. McAvoy was of the opinion that Plaintiff's right posterior tibial tendon dysfunction was caused by his severe pes planus. He testified that when the foot does not maintain its normal arch, the stress goes to the posterior tibial tendon and other tendons. He further testified that there is an area on the posterior tibial tendon, where there is poor vascularity and over time, stress on the posterior tibial tendon can cause attrition, thinning, splitting, or tearing of the tendon, causing the tendon to break down and become non-functional, as in Plaintiff's case.
14. In giving his expert medical opinion, Dr. Easley considered and disagreed with Dr. McAvoy's theory on the cause of Plaintiff's posterior tibial tendon dysfunction. Dr. Easley acknowledged that a flat-footed person could suffer an insidious onset of posterior tibial tendonitis; and development of posterior tibial tendonopathy could collapse the arch. He opined, however, that this process is typically associated with people, who are sixty years or older. It was Dr. Easley's opinion that is unlikely that such a process would occur in a person Plaintiff's age.
15. Dr. Easley further testified that Plaintiff had flat arches in both of his feet and he did not develop posterior tibial tendon dysfunction in the left foot, which also suggested to him that Plaintiff's right posterior tibial tendon dysfunction did not originate from his flat feet. He opined that it is much more likely that Plaintiff's right posterior tibial tendon dysfunction was the result of trauma than stress from his flat feet. Greater weight is given to the opinions of Dr. Easley over those of Dr. McAvoy.
16. Relying on Dr. McAvoy's earlier opinion that Plaintiff's right posterior tibial tendon dysfunction was not related to his ankle injury, Defendants denied liability for Plaintiff's ankle injury.
17. Following his injury by accident, Plaintiff was capable of performing his regular employment until his surgery on 16 June 2003, even though he was terminated on 22 May 2003. After his surgery, Plaintiff was physically incapable of weight bearing for three months. Thereafter, Dr. Easley opined that he should do weight bearing for one month before returning to light duty work. Plaintiff applied for unemployment compensation in October 2003, and began receiving weekly checks toward the end of October. Plaintiff has actively sought suitable employment since October 2003, but was unsuccessful through the time of hearing before the Deputy Commissioner on 24 February 2004.
18. At his 18 November 2003 evaluation, Dr. Easley determined that Plaintiff would be able to return to work with permanent restrictions of sedentary work, light lifting (less than fifty pounds) and a moderate amount of standing or walking.
19. In a 24 November 2003 letter, Dr. Easley released Plaintiff to return to work beginning with light duty, four hours a day and gradually progressing to an eight-hour workday over a period of six months. Considering his employment history, age and educational level; as of 24 November 2003, Plaintiff was capable of working four hours a day and was therefore only partially disabled. There is insufficient evidence from which to find when Plaintiff's condition would have progressed to the point where he was able to work more than four hours a day. Plaintiff has not reached maximum medical improvement and has not been rated for any permanent impairment of his ankle. Dr. Easley also recommended that vocational rehabilitation assistance be provided to the Plaintiff. Any partial or permanent partial disability that Plaintiff may be entitled to receive under N.C. Gen. Stat. §§ 97-30 or 97-31, cannot be determined until he has reached maximum medical improvement and has been rated.
20. Defendants are entitled to a credit for unemployment compensation received by Plaintiff during any period Plaintiff is awarded temporary total disability compensation herein.
21. The treatment provided to Plaintiff by Dr. Easley was reasonably required to effect a cure, provide relief or lessen his disability resulting from his 22 May 2000 work-related injury.
 ***********
Based on the foregoing Stipulations and Findings of Fact, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. On 22 May 2000, Plaintiff sustained a compensable injury by accident arising out of and in the course of his employment when a stack of shelves fell on his right ankle. N.C. Gen. Stat. § 97-2(6).
2. As a result of his compensable injury, Plaintiff required medical treatment and ultimately underwent surgery performed by Dr. Easley. N.C. Gen. Stat. §§ 97-2(19); 97-25.
3. Because of the complexity of Plaintiff's injury, Plaintiff must produce competent, expert medical testimony that a causal relationship exists between his compensable accident and his right posterior tibial tendon dysfunction and foot deformity. See Young v. Hickory BusinessFurniture, 353 N.C. 227, 358 S.E.2d 912 (2000); Click v. Pilot FreightCarriers, Inc., 300 N.C. 164, 265 S.E.2d 389 (1980). The burden of proof is upon Plaintiff to establish this causal relationship. See Holley vs.Acts, Inc., 357 N.C. 228, 234. 581 S.E.2d 750, 754 (2003). Here, Dr. Easley acknowledged that a flat-footed person could suffer an insidious onset of posterior tibial tendonitis; and development of posterior tibial tendonopathy could collapse the arch. He opined, however, that this process is typically associated with people, who are sixty years or older. It was Dr. Easley's opinion that is unlikely that such a process would occur in a person Plaintiff's age. Dr. Easley further testified that Plaintiff had flat arches in both of his feet and he did not develop posterior tibial tendon dysfunction in the left foot, which also suggested to him that Plaintiff's right posterior tibial tendon dysfunction did not originate from his flat feet. He opined that it is much more likely that Plaintiff's right posterior tibial tendon dysfunction was the result of trauma than stress from his flat feet. Plaintiff has established by the greater weight of evidence that there is a causal relationship between his compensable injury by accident of 22 May 2000 and his right posterior tibial tendon dysfunction and foot deformity.
4. As a result of his compensable injury, Plaintiff was incapable of working in any employment from 16 June 2003 through 24 November 2003. Thereafter, he was released on 24 November 2003, to sedentary to light duty duty work starting at four hours per day with a gradual progression to full duty. Plaintiff began looking for work in October 2003, but was unsuccessful after reasonable efforts. N.C. Gen. Stat §§ 97-29; 97-30.
5. As the result of his 22 May 2000 injury by accident, Plaintiff is entitled to be paid by Defendants total disability compensation at the rate of $190.83 per week from 16 June 2003 through 24 November 2003. N.C. Gen. Stat. § 97-29.
6. Since Plaintiff was released to return to work for four hours a day beginning 24 November 2003, and gradually progress to eight hours during a six-month period, Plaintiff was partially disabled after 24 November 2003. The record is insufficient to determine Plaintiff's entitlement to partial disability and shall be reopened for evidence of disability after 24 November 2003. N.C. Gen. Stat. § 97-30.
7. The medical treatment Plaintiff received from Dr. Easley, Dr. McAvoy and Nash Urgent Care was reasonably required to effect a cure, provide relief and lessen his disability arising from his compensable injury. N.C. Gen. Stat. §§ 97-2(19); 97-25.
8. The Full Commission retains jurisdiction over this case for determination of any partial or permanent partial disability compensation to which Plaintiff may be entitled. Plaintiff has not reached maximum medical improvement and has not been rated for any permanent impairment of his ankle.
 ***********
Based on the foregoing Stipulations, Findings of Fact and Conclusions of Law, the Full Commission makes the following:
 AWARD
1. Defendants shall pay to Plaintiff temporary total disability compensation at the rate of $190.83 per week from 16 June 2003 through 24 November 2003. This compensation having accrued shall be paid to plaintiff in a lump sum. Defendants shall receive a credit for any unemployment compensation Plaintiff received during this period.
2. Defendants shall pay all accrued and future medical expenses related to Plaintiff's compensable injury when bills are submitted and approved according to procedures adopted by the Commission.
3. Defendants shall pay to Plaintiff's attorney a reasonable attorney fee in the amount of twenty-five percent (25%) of the compensation awarded Plaintiff herein. The attorney fee shall be deducted from the compensation due Plaintiff and paid directly to Plaintiff's attorney.
4. Defendants shall pay the costs.
 *********** ORDER
Since Plaintiff was released to return to work for four hours a day beginning 24 November 2003, and gradually progress to eight hours during a six-month period, Plaintiff was partially disabled after 24 November 2003. The record is insufficient to determine Plaintiff's entitlement to partial disability and shall be reopened for evidence of disability after 24 November 2003.
IT IS THEREFORE ORDERED that this case is reopened for submission of additional evidence of Plaintiff's partial disability after 24 November 2003 and any permanent partial disability to which he may be entitled.
This the ___ day of October 2005.
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
 S/_____________ THOMAS J. BOLCH COMMISSIONER
DISSENTING:
 S/____________ BUCK LATTIMORE CHAIRMAN